**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| ROVELLE QUENTON ORANGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:19-CV-452-JPK |
| | ) | |
| UNITED STATES STEEL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Rovelle Quenton Orange filed a pro se complaint on November 27, 2019 alleging that his former employer, United States Steel Corporation ("USSC"), discriminated and retaliated against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a) and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2615(a)(2). The parties have consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. *See* (DE 13). Accordingly, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

Presently before the Court is USSC's Motion for Summary Judgment (DE 39). USSC filed the Motion, a Statement of Undisputed Material Facts, a Brief In Support of Its Motion, and an Appendix of Evidentiary Materials In Support, on April 29, 2021. (DE 39, 41, 42, 43). USSC also served Orange with a N.D. L.R. 56-1(f) notice regarding the filing of a summary judgment motion against an unrepresented party. (DE 40). Orange filed a Response to USSC's Motion on May 20, 2021 (DE 44), and USSC filed a Reply

Memorandum on June 3, 2021 (DE 45). Thus, USSC's motion is fully briefed and ready for ruling. For the reasons discussed below, the Court now grants USSC's motion for summary judgment.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure requires the entry of summary judgment against a party "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The applicable standard is well settled: summary judgment is appropriate against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of showing that summary judgment is proper given the undisputed facts. *Yancick*, 653 F.3d at 543. "Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented." *Wienco, Inc. v. Katahn Assoc., Inc.*, 965 F.2d 565, 568 (7th Cir. 1992). If, however, the moving party has met its initial burden of showing the absence of a genuine dispute regarding the material facts, the nonmoving party may not respond by resting on the pleadings alone. Instead, the nonmoving party must identify specific facts, supported by evidence upon which he relies, to establish there is a genuine triable issue. *Bilow v. Much Shelist Freed Deneberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 893 (7th Cir. 2001).

## BACKGROUND

### A.   INTRODUCTION

USSC contends that Orange has not complied with N.D. Indiana Local Rule 56.1, which requires a party opposing a summary judgment motion to include a statement in his response brief identifying the material facts that the party contends are genuinely disputed so as to make a trial necessary. Orange's response brief does include a section appropriately titled "Statement of Genuine Disputes." (DE 44 at 1-2). But, as USSC points out, Orange's statement does not respond to each of the facts USSC listed in its separately filed "Statement of Undisputed Material Facts." *See* N.D. Ind. L. R. 56-1(b)(2) (effective Feb. 25, 2022). At the time Orange filed his response brief, however, the local rule required only that "the nonmoving party submit potentially determinative facts and identify factual disputes that may preclude summary judgment." *Fausset v. Mortg. First, LLC*, No. 4:09-CV-42-PRC, 2010 WL 987169, at *3 (N.D. Ind. Mar. 12, 2010) (internal quotation marks and citation omitted). Orange's deposition (DE 49) and interrogatory responses (DE 31) identify facts that Orange contends are genuinely in dispute, and therefore functionally serve the same purpose as a separate fact statement. *See id.*; *see also Alexander v. Casino Queen, Inc.,* 739 F.3d 972, 978 (7th Cir. 2014) ("The weight of authority is that depositions can be the equivalent of affidavits, and are therefore admissible at the summary judgment stage.").

Because Orange is proceeding in this matter pro se, the Court will liberally construe Orange's summary judgment response brief as incorporating by reference his deposition testimony and interrogatory responses. *See Nichols v. Mich. City Plant Planning*

3

*Dep't*, 755 F.3d 594, 600 (7th Cir. 2014). In ruling on USSC's summary judgment motion, the Court will consider facts disputed by Orange in those discovery documents, but only to the extent that Orange could testify at trial to the matters asserted therein based on his personal knowledge. *See Alexander*, 739 F.3d at 978 (to be considered for purposes of a summary judgment motion, deposition testimony must be based on personal knowledge and set out facts that would be admissible at trial, and the deponent must be competent to testify on those matters). The Court also will consider properly supported facts in USSC's Statement of Undisputed Material Facts that have not been disputed by Orange in his discovery documents, although even those facts must be construed in favor of Orange as the nonmoving party. *See Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 543 (7th Cir. 2011); *Brettler v. Purdue Univ.*, 408 F. Supp. 2d 640, 646 n. 2 (N.D. Ind. 2006).

With these principles in mind, the Court will now set out those facts most relevant to USSC's summary judgment motion.

**B.**     FACTS

**1.**     MANAGEMENT ASSOCIATE POSITION

Orange, who is black, is a May 2017 graduate of Purdue University with a bachelor's degree in mechanical engineering. USSC, a steel manufacturer, hired Orange on June 19, 2017 to be a Management Associate at its Midwest Plant, a steel sheet finishing facility located in Portage, Indiana. The Management Associate program is an entry level program for recent college graduates who receive 12 to 24 months of accelerated professional development, including training across multiple functional areas in USSC's steel-making operations as well as training in leadership skills to prepare for an advanced

role in the company. USSC's job description for Management Associates states that the position may require rotating schedules, and weekend and holiday hours "[d]ue to the nature of [USSC's] business" and the fact that "some facilities operate 24 hours/day, 7 days/week, 365 days/year." Management Associates are not part of any collective bargaining unit, which means they serve as employees-at-will and are not protected by labor-negotiated progressive discipline policies.

Orange was hired by Joel Gillen, Area Manager of the Coatings Department in the Sheet Processing Department of the Steel Production Division of USSC Gary Works. Although Orange was initially hired into the Coatings Department, USSC planned to cross-train Orange in the Steel Production Division by assigning him to various other departments as well. While other Management Associates were hired around the same time for positions at USSC Gary Works, Orange was the only one in the Steel Production Division and the only one supervised by Gillen.

### 2. ORANGE'S INITIAL TRAINING (SUMMER 2017)

The Coatings Department consists of three "lines" or units, each led by a Coordinator: Andrew Curosh for the 72" Galvanized Line, Jon Lemons for the Galvanized 3 Line, and Gillen for the Combination Line. The Coordinators reported to Gillen. Orange was assigned to work on all three lines and received instructions from each of the three Coordinators. After his initial training, Orange would be assigned as a Shift Manager to work at any of the three finishing lines in the Coatings Department. The company's hiring goal was for Orange to become qualified and able to work independently as a Shift Manager within one year. As a Shift Manager, Orange would be

responsible for managing the operations, including supervisory and management responsibility, for approximately 50 hourly workers who rotated shifts on each of the three finishing lines. Shift Managers are required to assign and oversee the hourly employees' work, ensure a safe work performance, and accurately approve the line employees' hours. They also are responsible for promptly communicating operating conditions and issues to appropriate personnel during the shift, and, at the conclusion of the shift, for transitioning management responsibilities to the oncoming Shift Manager.

Orange received his initial training from multiple individuals in the Coatings Department, including but not limited to, Lemons and other Shift Managers such as Bill Mead and Deon Sutton. Sutton, who is black, has worked for USSC for approximately twenty years, of which ten were in the position of Shift Manager. Mead, who is apparently of European descent, was older than Orange, with over forty years of service with the company and nearing the end of his career. Mead did not have a college degree but had worked his way up to Shift Manager after having served as an hourly employee in every line position on every line in the department.[1]

### 3.   HARASSMENT BY MEAD (FALL 2017)

Orange finished his training and began working as a Shift Manager approximately three months into his new job. It was around this time that he started to experience harassment from Mead. Orange describes Mead as passive-aggressive, and states that

---

[1] In the Coatings Department, the line jobs held by hourly crew members included Crane Operators, Shearmen, Feeders, Inspectors, Banders, Assistant Operators, and Packers.

Mead often made offensive and condescending comments to him. For instance, Mead would ask Orange why Orange did not have any coffee made for him. Orange does not know if Mead asked other Shift Managers to make coffee as well. One time Mead complained to Orange, "Why didn't you replace the water jug? They don't teach you that in engineering school?" On another occasion, Orange saw Mead "smack[] the water bottle off the fountain and hit the wall." Orange believed this act was directed at him because he had not replaced the water bottle. The water bottle did not strike Orange, who simply "ignored" what occurred. Another time, Orange left a printout of a certificate showing he had completed a required computer module on his desk. He later discovered that "someone"---he believes Mead---had put the certificate on the office refrigerator with magnets. Orange thinks Mead did this to poke fun at him for having a college degree.

Mead never directly made any comment to Orange about his race. On two occasions, however, Mead made statements that "led [Orange] to believe that [Mead] was racist." The comments were directed to others but made either in Orange's presence or within his hearing distance. Both occasions occurred prior to October 2017. The first occasion was when Mead remarked to a contractor that a Cadillac in the parking lot was a "nice car," and then, looking in Orange's direction, said with a smirk on his face, "It must be Rovelle's." Orange felt "uncomfortable" by this remark, but never told Mead he was offended by it. He told Gillen about the remark in his October 2017 review when talking about "what it was like to work with" Mead. The second occasion was when Orange overheard Mead say to Lemons "something to the effect of should we remove all the confederate statues now." Orange found Mead's words "offensive." Orange did not

7

complain to either Mead or Lemons, however, and continued to go about his work. He did not report the incident to Gillen "that day," but did do so "over time."

Orange also testified about one other incident involving a line worker who is black. The line worker told Orange that he had asked Mead about getting paid for overtime when he had worked past Orange's shift into Mead's shift. Mead purportedly responded "Why don't you ask your friend Rovelle to make sure you get paid," and walked out of the room. Orange considered that comment to also be racially motivated because Mead "didn't say that to any other employee."

Orange reported the problems he was having with Mead to his supervisor, Gillen. The only times his reports were in writing was when Orange reported issues with Mead affecting his job performance in e-mails to management. But those emails just described the issues without reporting "the harassment side of it." Orange also reported the issues with Mead orally during his reviews with Gillen. He would tell Gillen that he was "having an issue with Mead, he's made remarks, he's making it harder for me to do my job." Gillen "would always say, 'I'll have a conversation with [Mead].'" Orange testified that he specifically informed Gillen that he believed Mead "was racially discriminating against [him]" on only two occasions, both in 2017, during his performance reviews. He told Gillen during those reviews in 2017 that Mead "was racially discriminating against him … and jealous of [his] background … because [he] had a college degree and [Mead] did not."[2]

_____

[2] USSC's Statement of Undisputed Material Facts states that "Orange never reported to any Coordinator, Gillen, or anyone that he believed he was subjected to any type of racial

### 4.   ORANGE'S SUPERVISORS' DIRECTIONS TO DISCIPLINE BLACK HOURLY EMPLOYEES (SPRING 2018 AND EARLY 2019)

Orange and the other Shift Managers were responsible for issuing discipline for work violations to the hourly workers under their supervision and management. On one occasion, in April or May 2018, Robbie Robinson, a black member of Orange's crew, made a mistake that resulted in a temporary shut-down of operations. A few days after the incident, Gillen emailed Orange asking whether Orange had issued discipline to Robinson for the shut-down. The email did not mention Robinson's race, but Orange believes Gillen knew which crew member was Robinson and therefore knew he was black. Orange responded to Gillen's email that he did not think discipline was warranted, because other members of his crew had made similar mistakes and he had not issued discipline to them. Gillen responded, "Do you know how many line stops this [line worker] has caused?" Orange answered that Robinson was not part of Orange's regular crew so Orange did not know about any past mistakes Robinson had made. Orange had heard that Robinson "had a rocky relationship with management," and speculated that Gillen may have wanted to "take the opportunity to get at him," although Orange admitted that Robinson "did do something wrong." Orange also admitted he did not know any details about the other crew members who he claims made similar mistakes and did not get disciplined for them, such as the length of the delay caused by their

___

discrimination and/or retaliation by anyone," citing to Gillen's affidavit as support. (DE 41 ¶ 51). But it is clear from the record that this statement is disputed, as Orange testified at his deposition that he did in fact report to Gillen that he was subjected to racial discrimination by Mead twice in 2017.

mistakes or their discipline history compared to Robinson's. Still, Gillen did not email any response back to Orange when he explained his reason for not disciplining Robinson, which indicated to Orange that "[m]aybe [Gillen] agreed with him." Orange "felt like once [he] stated [his] case and [his] reason [Gillen] … left it alone." Ultimately Robinson did not receive discipline for the incident.

Another time in 2018, Curosh asked Orange to investigate an incident that involved a three-member crew consisting of two black members and another member apparently of European descent. After talking to the three crew members, Orange reported to Curosh that he believed discipline was not warranted, and no discipline was issued. But Orange felt "like [Curosh] still wanted [him] to issue discipline, … no matter what information came up." The only other occasion that Curosh asked Orange to investigate whether discipline was warranted involved a white employee and a Hispanic employee. On that occasion, Orange issued discipline to the employees in question pursuant to instructions from Curosh.

Finally, Orange also testified about one time (in early 2019) when his new supervisor, Dominguez, directed him to discipline a black employee named Sinclair. Orange agreed with Dominguez that discipline to Sinclair was justified, but the decision to impose the discipline was made by Dominguez, not Orange. Orange testified that a week later, a white employee made the same mistake. The white employee was not part of Orange's crew and Orange only knew about the situation from seeing emailed reports from the responsible Shift Manager. To Orange's knowledge, the white employee was not disciplined.

### 5.    FMLA LEAVE OF ABSENCE (JULY-OCTOBER 2018)

Orange took leave of absence under the FMLA for the birth of his first child. His leave ran from July 30, 2018 through October 2, 2018. When he came back from his leave, Orange returned to the same department, the same position, the same duties, and the same pay. Upon his return to the office, Orange saw that someone had replaced his name with "Mr. Mom" on a board in the office that was used to display the names of the Shift Managers. Orange does not know who replaced his name with "Mr. Mom," but he concluded it was Mead because an employee told him that Mead had been going around calling Orange "Mr. Mom" while Orange was on leave. Orange replaced "Mr. Mom" with his name and did not raise the issue with Mead or anyone else.

### 6.    PERFORMANCE REVIEWS (OCTOBER 2018)

During Orange's tenure in the Coatings Department, Gillen conducted reviews and evaluations with him on his performance. In Orange's August 2017 review, he received "on target" ratings in all categories. (DE 43-5 at 5-6). Gillen wrote in the review that Orange had just started in the Coatings Department and "has a long way to go in order to become an effective leader. He will need to continue to ask questions of both other managers and of the hourly in order to obtain the knowledge that he will need in order to make good decisions going forward." (*Id.* at 7). Orange received an overall rating of 3 out of 5/"meets" expectations in his 2017 end-of-year review. (*Id.* at 11). In the comments section, Gillen wrote that Orange "was hired in this summer and has progressed very well so far in his limited time here. … He is picking up more things every week." (*Id.* at 9).

Another review took place on October 22, 2018, and indicates "[n]o change from previous due to [Orange] missing 9 weeks from July 28th-Oct. 2nd" for FMLA leave. (*Id.* at 12). Gillen told Orange during the review that he was "doing well" in two areas: filling out information on daily turn reports and communication with the crew. (*Id.*). However, he told Orange that he "can do better" in two other areas: (1) communicating ("When the line shuts down there is supposed to be an email sent out within 30 minutes as to why, [and] this does not always happen."); and (2) understanding of the process by asking more questions ("I notice that you don't always understand what is going on, also I notice that you don't ask a lot of questions to gain the understanding."). (*Id.*).

### 7.    CONTINUED HARASSMENT BY MEAD (OCTOBER TO DECEMBER 2018)

Mead's harassment became more aggressive after Orange returned from FMLA leave. He provoked arguments with Orange, cursed and yelled at Orange, and tried to intimidate Orange into performing Mead's work duties in addition to Orange's own duties. Orange pushed back, telling Mead that he would not do Mead's job and reporting Mead's behavior to their bosses. After that, Mead gave Orange the silent treatment every time Orange would relieve him as Shift Manager. This was a problem because each manager has to tell the next manager what is going on, so that they will be prepared to run their shift. Mead would not give Orange vital information when Orange came into work, which made it difficult for Orange to do his job. When Orange would get ready to leave work, Mead would stay in his car and not come into the office until Orange got into his car and left. Because of this, Orange could not tell Mead anything about what

happened on Orange's shift, so Mead could prepare for his own shift. Mead later lied and spread rumors to the line workers, saying that it was Orange who would stay in his car and would not come in the office to receive vital information about the shift.

In late December 2018, the situation with Mead came to a head when Mead accused Orange of forgetting to pay his (Orange's) crew. Mead said that he had paid Orange's crew for Orange. Orange in fact had paid his crew, and the next day, Orange discovered that Mead had not paid *his* (Mead's) crew, the exact thing Mead had accused Orange of not doing. Orange sent Mead an email with a screenshot to prove that it was Mead, and not him, who had forgotten to pay his crew. Mead's email response cursed Orange, and Orange's email reply cursed back.[3] Orange forwarded the emails to his supervisors and other managers so they could see what was going on and how Mead was treating him.  Gillen testified that, after being made aware of the situation between Mead and Orange, and specifically, the email issue in December, he admonished both Orange and Mead to stop their behavior towards each other, which he concluded was based on generational issues and/or personality. (DE 43-4 ¶ 11).

### 8.   ANNUAL PERFORMANCE REVIEW (JANUARY 2019)

In Orange's 2018 annual performance review, Gillen rated Orange as "meets" expectations in all areas but two. He gave Orange a "needs improvement" rating the categories of "deliver breakthroughs across the value chain" and "effective

---

[3] Mead wrote, "What are you trying to prove, that you are still an asshole[?]." Orange replied, "How about you say 'thank you for paying my crew Rovelle,' you fat piece of shit. . . . do a thorough job, but that is probably something you are not capable of."

communication." (DE 43-5 at 18). Gillen wrote in the review that Orange, "as a[ ] M[anagement] [A]ssociate in Operating needs to continue to work on learning the process and communicating with other  managers on any issues that are going on. He has been with us for a year and a half now and needs to accelerate the curve on learning the process." (*Id.* at 15). Gillen also wrote that Orange "has made some good recent improvements on his communications with other managers, but needs to continue to work on this." (*Id.*). Gillen noted that Orange "needs to get out ahead of things and not wait for someone to tell him what to do." (*Id.* at 16).

When Orange met with Gillen to discuss his 2018 annual review, he and Gillen talked about the Mead email incident in December, with Gillen saying that he did not know the situation with Mead had gotten that bad. Orange testified that he said in response to this: "I've told you about the relationship with Bill Mead. I've sent you emails about what's going on when we have an argument. How can you not know it has gotten this bad when I constantly send you e-mails about the times where he's not doing his job and time where this comes up?" Gillen then told Orange that if his boss had seen the emails between Orange and Mead, both of them would have been fired. But Gillen said he talked to Jack Finlayson, the Plant Manager, who instructed Gillen to have a talk with Orange and Mead about the situation.

### 9.    TRANSFER TO COLD ROLL DEPARTMENT (JANUARY 24, 2019)

On January 24, 2019, Orange was transferred from the Coatings Department to another department in the Sheet Processing Department called the Cold Roll Department

(a/k/a Cold Mill). He was told by Gillen that the purpose of the transfer was to get additional training, and that made sense to Orange because the Management Associate informational packet he received when he was hired stated that to qualify for a promotion to the next level of Manager 1, the Management Associate had to "go downstream and work at [a] different department[ ]." (Dep. at 160; *see also* Gillen Aff., DE 43-4 ¶ 19 ("It is common for Management Associates to transfer to other departments in order to increase their training and knowledge of USS[C's] processes."). Orange believed that the transfer was initiated by Gillen because he was Orange's supervisor. But in fact the transfer was initiated by Cold Roll Area Manager Daniel Dominguez, and approved by Plant Manager Jack Finlayson. (Gillen Aff., DE 43-4 ¶¶ 19-20). Gillen did not learn of the transfer until shortly before it occurred. (*Id.* ¶ 20). At the same time as Orange was transferred from Coatings to Cold Roll, another employee, John Lesko, was transferred from Cold Roll to Coatings to be cross-trained. (*Id.*). Orange's transfer to the Cold Roll Department did not affect his title or responsibility level. He remained a Management Associate, was assigned as a Shift Manager, had supervisory and management responsibility for roughly the same number of crew members, and continued to receive training.

Upon his arrival to the Cold Roll Department, Dominguez, who replaced Gillen as Orange's supervisor, immediately began to criticize Orange's job performance. There were discussions "all the time" between Orange and Dominguez regarding the latter's "expectations" for Orange's performance as a Shift Manager. Dominguez was particularly critical of Orange's arrival time for work, and demanded that Orange clock in earlier than the time when Orange believed he demanded other managers to clock in.

Orange was told that this was because he was new and needed to learn the line. Dominguez also required Orange to give certain information on company reports that Orange believed was more than other managers were required to provide. He threatened to not pay Orange if Orange did not complete monthly assignments like crane reports, even though Orange believed it was not unusual for managers to not complete their crane reports. Orange complains that Dominguez asked him to forge a crane inspection report for the previous month. Orange testified that he did so under the threat and fear that Dominguez would not pay him if he did forge the report. Orange also complains that Dominguez required him to conduct safety meetings beyond the one per month Orange believed other Shift Managers were required to conduct. Although Orange states that other Shift Managers were not expected to do all these things that Dominguez expected of him, he admits that he does not have personal knowledge of the other Shift Manager's discipline records or performance reviews so he cannot say whether any other Shift Managers were disciplined for the same or similar performance issues.

### 10.   TERMINATION (APRIL 8, 2019)

In late March 2019, Dominguez, who did not have the authority to terminate Orange's employment, initiated that process by contacting Director of Employee Relations James Van Buren. (DE 43-5 ¶ 5). The ultimate decision to terminate was made by Van Buren and Plant Manager Jack Finlayson, after they reviewed information about Orange's performance deficiencies, occurring over several months, which was put together by Gillen and Dominguez. (*Id.* ¶ 4). Based upon multiple performance deficiencies that had been noted by Dominguez and Gillen, Finlayson and Van Buren

concluded that Orange lacked the required skills, technical expertise, and knowledge necessary to function as a competent Shift Manager in the Cold Roll Department, and that he had failed to demonstrate the expected progress as a Shift Manager, especially given the time he had served in that position in the Coatings Department. On April 8, 2019, Dominguez and a manager from Human Resources met with Orange and informed him that he was being terminated for poor performance. Orange was told that, after more than a year and a half in the position of Management Associate, he had failed to demonstrate the expected level of knowledge about the operations, and failed to display appropriate progress as a manager.

Orange filed an EEOC Charge against USSC on June 17, 2019. (DE 1 at 4). In the Charge, Orange checked the boxes for race discrimination and retaliation. He alleged that he was subjected to disparate terms and conditions of his employment when he was asked to discipline black employees but not white employees who were known to have committed the same infraction. He also alleged that USSC failed to promote him and subjected him to "racial harassment," and that, when he complained, he was demoted and then discharged. (*Id.*) On August 27, 2019, the EEOC issued a right to sue letter, and, on November 27, 2019, Orange filed this lawsuit.

## DISCUSSION

### I. DISPARATE TREATMENT CLAIM

Title VII prohibits an employer from discriminating against an employee in the terms, conditions or privileges of employment on the basis of an employee's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a). There is no dispute that Orange,

as a black employee, is in a class protected by the statute. Thus, to defeat summary judgment, Orange must present evidence that he has been the subject of an adverse employment action, and that USSC took that adverse action on account of his race. *See Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013).

### A.    ADVERSE EMPLOYMENT ACTION REQUIREMENT

Orange claims he was discriminated against when: (1) Gillen and Curosh secretly supported Mead over him; (2) Gillen asked him to write up a black employee and Curosh questioned him about not disciplining employees who were "mostly black" (Dep. at 57); (3) Gillen gave him negative reviews and then transferred him to the Cold Roll Department; (4) Dominguez imposed job requirements on him that were not imposed on other Shift Managers; (5) he was not promoted to a Manager I position; and (6) he was terminated. (Dep. at 58).

Not everything that makes an employee unhappy gives rise to a discrimination claim. *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007). "A materially adverse employment action is something 'more destructive than a mere inconvenience or an alteration of job responsibilities.'" *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993)). Materially adverse employment actions generally fall into one of three categories: (1) those affecting an employee's finances (including a demotion or termination), (2) actions involving a change in an employee's career prospects by preventing him from using his skills, and (3) those where the conditions of employment

change to subject the employee to humiliating, degrading, or unsafe conditions. *Nichols*, 510 F.3d at 780.

Some of the items on Orange's list of complaints may not qualify as an adverse employment action. For instance, a job transfer that involves similar duties and same pay generally is not an actionable adverse employment action, unless it creates unsafe or degrading conditions for the employee.[4] *See, e.g., O'Neal v. City of Chicago,* 392 F.3d 909, 911-12 (7th Cir. 2004); *see also Nichols,* 510 F.3d at 780. Similarly, negative performance evaluations, by themselves, generally are not adverse employment actions either. *See, e.g., Beamon v. Marshall & Ilsley Tr. Co.,* 411 F.3d 854, 862 (7th Cir. 2005). Still, a failure to promote and termination undoubtedly are adverse employment actions. *See Everroad v. Scott Truck Sys., Inc.,* 604 F.3d 471, 481 (7th Cir. 2010); *Volovsek v. Wis. Dep't of Agr., Trade & Consumer Prot.,* 344 F.3d 680, 688 (7th Cir. 2003). Furthermore, the other actions of which Orange complains, though they technically may not be adverse employment actions, still can be considered as evidence in support of Orange's discrimination claims based on his non-promotion or termination. *See, e.g., Beamon,* 411 F.3d at 862; *Volovskek,* 344 F.3d at 688. Therefore, the Court will focus on the third and ultimately dispositive inquiry of whether a reasonable jury could conclude that any of the disparate treatment of which Orange complains (whether technically an adverse employment action or not)

---

[4] Orange asserts that his transfer to the Cold Roll Department "caused adverse work conditions" because his work schedule changed from 4 days on/4 days off, to 7 days on/1 day off. (DE 44 at 44). But working different schedules is part of the job description for Management Associates. (DE 43-4 ¶ 2). The change in work hours, therefore, was not a "materially adverse" change in Orange's position.

occurred because of Orange's race. If the evidence is insufficient for a jury to conclude that the treatment in question occurred because of Orange's race, then Orange's disparate treatment claim will fail for that reason rather than because Orange did not satisfy the requirement of an adverse employment action.

### B. CAUSATION REQUIREMENT

"In discrimination cases, '[w]hen a defendant moves for summary judgment, the "singular question" for the district court is whether the plaintiff has introduced evidence that would "permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action."'" *Igasaki v. Ill. Dep't of Fin. & Prof'l. Regulation*, 988 F.3d 948, 957 (7th Cir. 2021) (quoting *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020) (quoting *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018))). "Whether a plaintiff offers direct or circumstantial evidence of discrimination, [the Seventh Circuit] made clear in *Ortiz v. Werner Enters., Inc.* [834 F.3d 760, 766 (7th Cir. 2016)] that 'all evidence belongs in a single pile and must be evaluated as a whole.'" *Igaskaki*, 988 F.3d at 957 (quoting *Ortiz*).

USSC applies the burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), in arguing that the evidence is insufficient for a jury to conclude that any of the items on Orange's list of negative experiences are connected to Orange's race. The Seventh Circuit has made clear since *Ortiz* that the familiar *McDonnell Douglas* burden-shifting framework "remains an efficient way to organize, present, and assess evidence in discrimination cases." *Khungar v. Access Cmty. Health Network*, 985 F.3d

565, 573 (7th Cir. 2021) (quoting *Johnson*, 892 F.3d at 894). But Orange does not present his arguments against summary judgment using the *McDonnel-Douglas* burden-shifting framework. *Compare Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020) (applying *McDonnell Douglas* framework because "both parties use it"). "[A] plaintiff need not use the *McDonell Douglas* framework after *Ortiz*. At summary judgment, '[w]hat matters is whether [a plaintiff] presented enough evidence to allow the jury to find in [his] favor.'" *Igasaki*, 988 F.3d at 957–58 (quoting *Vega v. Chi. Park Dist.*, 954 F.3d 996, 1004 (7th Cir. 2020)). Thus, the Court will "approach [Orange's] [discrimination] claim as [he] present[s]" it, *Logan v. City of Chicago*, 4 F.4th 529, 537 (7th Cir. 2021), viewing the evidence of discrimination on which Orange relies "holistically," *Chatman v. Bd. of Edu. of City of Chicago*, 5 F.4th 738, 746 (7th Cir. 2021), as *Ortiz* requires.

Orange does not point to evidence by which USSC admitted that any of the actions about which Orange complains were motivated by Orange's race. *See Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009). Thus, as is often the case, Orange must rely on circumstantial evidence of racially discriminatory animus. Circumstantial evidence includes things such as suspicious timing, evidence that similarly situated employees were treated differently, and evidence that the reason given by the employer for an adverse action is pretextual. *See Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012), *overruled in part on other grounds*, *Ortiz*, 834 F.3d at 764.

Orange "recites a litany of past wrongs," *Igasaki*, 988 F.3d at 958, purportedly probative of race discrimination, including negative performance reviews, transfer to another department, constant admonishment, arbitrary demands regarding job

requirements, and general harsh treatment. "For [Orange], this disparate treatment is enough to show that [USSC] terminated him because of his [race]. It is not." *Id.* None of "the experiences [Orange] has identified . . . point directly to a discriminatory reason for" USSC's actions. *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 900 (7th Cir. 2016) (quoting *Adams v. Wal–Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)). And "[s]imply being a member of a protected class, without something more to link that status to the action in question, is not enough to raise a reasonable inference of discriminatory animus." *Id.* (citing *Beamon*, 411 F.3d at 863 (for purposes of evaluating a hostile work environment claim, "not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority")); *see also Hoosier v. Greenwood Hosp. Mgmt. LLC*, 32 F. Supp. 3d 966, 979 (N.D. Ill. 2014) (same). "'[I]f the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed.'" *Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006) (quoting *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 841–42 (7th Cir. 1996) (quoting *Visser v. Packer Eng'g Assocs.*, 924 F.2d 655, 659 (7th Cir. 1991))).

Orange attempts to show discriminatory animus motivated his treatment by citing the Cadillac and confederate statutes comments made by Mead. Such statements may constitute evidence of discriminatory motive. *See Good*, 673 F.3d at 675. But Orange admitted that none of his *supervisors* (Gillen, Curosh, Dominguez) ever said anything racially offensive or insensitive. He testified that Mead was the only person with whom

he worked while employed by USSC who made comments he believed were indicative of racial discrimination. Mead's Cadillac and confederate statutes comments are not to be condoned and depending on their tone and context may have been especially problematic. These comments, however, are not evidence of racial discrimination *by USSC* since Mead "was not one of the decisionmakers for any of the employment decisions at issue here." *Mlynczak*, 442 F.3d at 1057–58 (citing *Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 723 (7th Cir. 2001) ("Stray remarks made by nondecisionmakers are not evidence that the decision had a discriminatory motive.")).

Still, Orange argues Mead's two comments show discrimination by his employer because he believes that Gillen and Curosh secretly "supported" Mead over him. Orange testified that Gillen's support of Mead was shown by the December email exchange Orange had with Mead about forgetting to pay their crew members. But Orange does not dispute that Gillen cautioned Mead as well as Orange about the incident. Orange speculates that his transfer out of Gillen's department was motivated by the email incident, noting that Mead was allowed to remain in the same position under Gillen until his retirement not long afterwards. But there is no evidence to connect Orange's transfer to the Cold Mill Department to the December email incident other than that the transfer happened about a month after the email incident. "Under ordinary circumstances, '[c]lose temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment *provided that* there is other evidence that supports the inference of a causal link.'" *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 390 (7th Cir. 2012) (quoting *Scaife v. Cook Cnty.*, 446 F.3d 735, 742 (7th Cir. 2006) (internal quotation

marks omitted, emphasis added))). There is no additional evidence of a causal link here. Suspicious timing alone "rarely" creates a triable issue on causation. *Id.* at 389. This is not one of those rare situations. *See id.* The transfer was also one that was expected for those who, like Orange, were in the Management Associate program. In addition, it is undisputed that Orange's transfer was initiated by Dominguez, and that Gillen did not know about the transfer until shortly before it occurred. There is nothing in the record to suggest that Dominguez knew anything about the email exchange with Mead. Orange admits that he does not know when the decision to transfer him was made or who made it..

In any event, even *if* Gillen supported Mead over Orange, there is no evidence that would link that support to animosity against Orange *because of his race*. No evidence suggests that either the email exchange itself, or how Gillen handled the incident, had anything to do with Orange's race. And Orange's speculation for why he was transferred aside, there is no evidence that Gillen's allegedly more favored treatment of Mead in transferring Orange had anything to do with race. Indeed, Orange offers more than one reason for his transfer, testifying at another point that he heard a rumor that Gillen was not happy with his performance and wanted to fire him but didn't like confrontation. So he delegated the firing to Dominguez by transferring Orange to Dominguez's department. (Dep. at 142-144). Of course, those "rumors" are hearsay, and "[a] party may not rely on inadmissible hearsay to avoid summary judgment." *MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011). But in any event, the rumors, even if true, only prove that Gillen and/or Dominguez wanted Orange to be

terminated for bad job performance. As Orange admitted, nothing about this inadmissible testimony demonstrates that their reasons for wanting Orange terminated had to do with racial animosity. (Dep. at 144). Orange infers discrimination because he claims Gillen lied when he told Orange that the transfer was for cross-training purposes rather than for poor job performance. (Dep. at 146). But this inference is based solely on Orange's speculation, which is based on inadmissible hearsay. There is no evidence that the reason for the job transfer was to allow Orange to be terminated by Dominguez.

Given Orange's arguments covered so far in this opinion, it is not surprising that Orange speculates further about possible connections between Gillen wanting him fired (which is itself speculation) and Orange's race. According to Orange, another possible reason why Gillen wanted him transferred and fired was that he was upset that Orange stood up to him about issuing discipline to Robinson, the black crewmember who had caused a line shutdown. Again, suspicious timing alone is insufficient to create an inference of causation, and here, the inference is even more of a stretch given the nine-month period between Orange's encounter with Gillen over Robinson and Orange's transfer, which led to his termination. *See Lalvani v. Cook Cnty., Ill.*, 269 F.3d 785, 791) (7th Cir. 2001) ("There will be cases in which a plaintiff can demonstrate causation despite a substantial time lag. This, however, is not one of them."); *see also Milligan*, 686 F.3d at 390 (six month interval insufficient to raise a jury question (citing *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir.2008), which held that a seven-week interval was insufficient)).

Moreover, the email exchange between Gillen and Orange discussing the discipline issue shows no indication that Gillen was upset over Orange's push-back to

Gillen's suggestion that Robinson be disciplined. Orange gave his reasons for not disciplining Robinson, Robinson was not disciplined, and Gillen never said anything more on the subject. Orange testified that he inferred from the "tone" of Gillen's email that Gillen was annoyed or angry at Orange, but that inference alone does not create a triable issue of fact. In any event, the emails in which Gillen may have sounded annoyed were talking about Robinson and his past mistakes; Gillen never responded at all to the final email of Orange's "push back." Finally, even if Gillen transferred Orange over this incident, his motive, as Orange himself describes it, would be retaliatory for the reason that Orange stood up to him, not for the reason that Orange is black. One could perhaps find a triable issue of fact if it was also assumed that Gillen was motivated to take some action due to Robinson's race. But in fact, as Orange himself admitted, Robinson made a mistake, and that mistake caused a stop in production. Orange presents nothing in the record to suggest this consideration of discipline was motivated by race.

Of course, the Robinson incident is part of a larger issue Orange submits in support of his discrimination argument: the contention that his supervisors asked him to write up black employees for discipline. It is true that the employee discipline issue is the only item on Orange's list of negative experiences (other than the two comments made by Mead discussed previously) that has even an arguable connection to the issue of race. But it is unclear how his supervisors' requests that he discipline a very limited number of black employees[5] demonstrate that any adverse employment action taken against Orange

_____

[5] Orange testified that Gillen and Dominguez asked him to discipline a black employee on only *one* occasion each. Curosh asked him to investigate whether to issue discipline

was motivated by racial discrimination. To the extent that Orange's argument is that his supervisors were being more lenient on white employees than black employees, first, Orange has offered no evidence to support the contention,[6] and, second, even if he did, that would be evidence of discrimination *against the employees*, not against Orange.

The Court perceives from Orange's discovery responses that the crux of Orange's complaint about the discipline issue is his belief that his supervisors were using him to deliver the discipline to the black employees in question because they thought it would go over better with those employees if the discipline came from a supervisor who was also black. It is not certain that motivation, if true, would show a triable issue of fact. In any event, Orange has no evidence to support this assertion, such as evidence that the same supervisors never instructed white Shift Managers to issue discipline to black employees. Orange admits that it was part of his job to discipline employees, and he does not deny that the employees in question were subject to his employer's discipline policies for the conduct in question. No reasonable jury could conclude that Orange's testimony

---

on two occasions, but one of those did not involve a black employee. The one occasion with Curosh that did include a black employee involved a single incident with three crew members, two black and one white.

[6] Orange presented no evidence that white employees were disciplined less often than black employees. And although he asserted multiple times that he was "only" ever asked to discipline black employees, he later had to retract that testimony when he admitted that Curosh had asked him to investigate whether discipline was appropriate for an incident that involved one white employee and two black employees, and another incident that involved a white employee and a Hispanic employee.

about being instructed to discipline black employees demonstrates racial animus or discriminatory motive on the part of the instructing supervisors.

Next, the Court considers Orange's complaints that Dominguez singled him out and treated him worse than other Shift Managers because of his race. The Court accepts as true that Dominguez was overly critical of Orange and treated him harshly. "However, anti-discrimination laws are not triggered by rude behavior." *Hoosier*, 32 F. Supp. 3d at 978. "The record before this Court is devoid of any indication that [Dominguez's] conduct was 'inherently racial' or . . . revealed 'negative attitudes toward African–Americans,' or that such conduct had 'racial ... overtones.'" *Id.* (quoting *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345–46 (7th Cir. 1999)); *see also Logan*, 4 F.4th at 537 ("even assuming Logan was singled out for discipline, he failed to 'provide evidence that supports the inference that the real reason' he was singled out 'was discriminatory'" (quoting *Stockwell v. City of Harvey*, 597 F.3d 895, 902 (7th Cir. 2010)).

Orange's claim that Dominguez held him to a different standard than other Shift Managers also is not supported by any evidence. According to Orange, Dominguez ordered him to come into work early, conduct extra safety sessions, always prepare timely crane reports, and include extra information in the reports, none of which was required of other Shift Managers. But there is no evidence besides Orange's testimony that other Shift Managers were not asked to do the same things. More importantly, if Orange is to be believed that they were not asked, he still admitted that he did not know whether those individuals were treated differently than him, that is, he had no personal knowledge whether they were disciplined for the same failures or omissions as he was.

28

*See Barrett v. Ill. Cmty. Coll. Dist.* No. 515, No. 15 CV 2334, 2019 WL 3554109, at *8 (N.D. Ill. Aug. 5, 2019) ("Dr. Barrett claims that white female employees did not have to similarly defend their work, but this is speculation; he provides no evidence to support it."); *see also Igasaki*, 988 F.3d at 958 ("Igasaki presented no evidence concerning a similarly situated employee from which the district court could draw a comparison.").

In addition, all of the other Shift Managers in the Cold Roll Department had significantly more experience and seniority than Orange. (Dep. at 155; DE 41 ¶ 40). Accordingly, even if those other Shift Managers were treated differently than him, Orange has not shown that they were similarly situated employees. *See Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014) ("A similarly situated employee must be 'directly comparable' to plaintiffs 'in all material respects.'" (quoting *Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 810 (7th Cir. 2011)). Furthermore, Orange has not disputed that two of those other Shift Managers are black, "undercutting an inference that," *Barrett*, 2019 WL 3554109, at *8, Orange's disparate treatment was race-based. *See, e.g., Arizonovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 702–03 (7th Cir. 2012) ("The 'similarly-situated' inquiry . . . at least requires that the plaintiff name a comparator outside her protected class.").

Finally, Orange concedes that none of the other Shift Managers were Management Associates. "[C]omparators must be similar enough that differences in their treatment cannot be explained by other variables, such as distinctions in their roles or performance histories." *Senske v. Sybase, Inc.*, 588 F.3d 501, 510 (7th Cir. 2009). "Where the issue is the quality of a plaintiff's work, a difference between the plaintiff's and comparators'

positions can be important because this difference will often by itself account for the less favorable treatment of the plaintiff." *Coleman*, 667 F.3d at 849. Shift Managers who were also Management Associates, unlike those who were not, are expected by USSC to perform at a level that would justify accelerated placement at advanced positions in the company. *See, e.g., Senske*, 588 F.3d at 510 (salesmen with "lower-ranking sales positions" were not similarly situated to the plaintiff, who was fired for performance reasons); *Burks v. Wis. Dept. of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (a receptionist and a supervisor were not similarly situated to the plaintiff, a program manager who was fired for performance reasons); *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 626 (7th Cir. 2006) (tenured university professors were not similarly situated to untenured plaintiff professor who was not reappointed after "widespread complaints from both students and supervisors").

Orange also argues he was treated less favorably than other Management Associates, who he contends were promoted to the Manager 1 position. (Dep. at 155-156). But Orange admitted he never applied for a Manager 1 position. *See Barrett*, 2019 WL 3554109, at *8 (rejecting non-promotion claim where the plaintiff did "not point to any specific promotions he missed out on, instead objecting to the fact he was never chosen"); *see also Riley v. Elkhart Cmty. Schs.*, 829 F.3d 886, 892 (7th Cir. 2016) (noting that to state a prima-facie failure-to-promote claim a plaintiff must show that he applied for and was rejected from the position). Furthermore, the other Management Associates who got promoted were not similarly situated to Orange because, as Orange admitted, they worked in different departments and had different supervisors than him. *See Patton v.*

*Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 338 (7th Cir. 2002) (rejecting comparator who "was not even under the supervision of the same decision-maker"); *see also Coleman*, 667 F.3d at 847 ("The similarly-situated requirement normally entails the existence of a common supervisor") (internal quotation mark and citation omitted).

Orange also fails to provide any details about the position of Manager 1, which would be necessary to support a non-promotion claim. *See, e.g., Barrett*, 2019 WL 3554109, at *8 (pointing out that the plaintiff did "not address whether or when [his employer] was looking for a new coordinator," stating that, "[w]ithout any of these details, a reasonable juror could not pinpoint anything about the [decisionmakers'] motivations not to [promote] [the plaintiff], let alone conclude that they were motivated by his race"); *see also Riley,* 829 F.3d at 892 ("Denial of a promotion constitutes a materially adverse action if "the position for which a plaintiff was rejected offered markedly greater compensation, responsibilities, or title."). In fact, the only evidence on the subject is Orange's testimony admitting that he was not qualified for a promotion to Manager 1 until after he received cross-training in a different department, which was the stated reason for his transfer to the Cold Mill Department. There is simply nothing in the record linking Orange's non-promotion to his race. *Barrett*, 2019 WL 3554109, at *8 ("No reasonable juror could conclude that [plaintiff] was not elected chair because of his protected characteristics."); *see also Lindale v. Tokheim Corp.*, 145 F.3d 953, 957 (7th Cir. 1998) (finding that "a suspicion

that [the plaintiff's protected class] may have played a role in her failing to be promoted ... is not enough").[7]

Finally, the Court arrives at the nub of Orange's disparate treatment claim: his contention that his termination for poor job performance was pretextual. According to James Van Buren, Director, Employee Relations for USSC, Orange demonstrated consistent performance deficiencies in at least the following respects: he repeatedly was told to arrive at work 30 minutes before his shift started, which he failed to do; he had difficulty learning the operations processes; he lacked good communication skills; he failed to perform housekeeping inspections; he failed to attend required safety meetings; he failed to ask questions about the Cold Roll processes and demonstrated slow learning of many processes; he failed to follow-up on various assignments (including hot band unloading and housekeeping) and did not assign downturn work to laborers; he continually failed to pay his crews correctly and did not have a good handle on which of his crew members were working; and he had to be continually reminded to give details on unit delays. (DE 43-5 ¶ 6). According to a document prepared with input by both Gillen and Dominguez for review by Van Buren and Finlayson, Orange had been told in October 2018 and at his 2018 year-end review "that he needed to accelerate his learning curve due to not picking up on operations," and, when he was moved to Cold Mill, the expectations of a manager in that department were explained to him but he had to be

---

[7] Orange testified that he applied for a few other positions at USSC but he did not have any complaint about being denied those jobs based on his race. (Dep. at 163).

reminded about them more than once, and, further, he was "[n]ot picking up on the process very quickly and not asking questions about it." (DE 43-5 at 19).

Orange vigorously disputes this testimony, asserting that the stated job deficiencies are all untrue. But "[t]he question is not whether [USSC's] assessment of [Orange's] performance was correct, only that it was an honest belief and not a pretext for age discrimination." *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 465 (7th Cir. 2014). Pretext "requires more than just faulty reasoning or mistaken judgment on the part of the employer; rather the plaintiff must show that the reason given is [a] lie, specifically a phony reason for some action." *McCann v. Badger Mining Corp.*, 965 F.3d 578, 589 (7th Cir. 2020) (internal quotation marks and citations omitted); *see also Widmar*, 772 F.3d at 465 (the plaintiff must raise "a genuine issue about the honesty, not the accuracy, of [the employer's] stated reasons for his termination").

While Orange calls the asserted job deficiencies "lies," he has not raised a genuine issue for trial as to the honesty of USSC's stated reasons for his termination. To raise a genuine issue for trial, he must identify "such weaknesses, implausibilities, inconsistencies, or contradictions in [USSC's] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that [USSC] did not act for the asserted non-discriminatory reasons." *Widmar*, 772 F.3d at 465. Orange devotes a great deal of effort trying to prove that Dominguez's criticisms of his job performance while a manager in the Cold Mill Department were false. For instance, he asserts that no managers had completed their crane inspections and he did not complete his as well, until he was assigned and properly trained. (DE 44 at 13). He also asserts that shift records

for a certain period demonstrate that more hot band coils were unloaded on his shift than on any other (*id.* at 21), and for another period, the same records show that "[t]ransportation could not bring threw coils inside to be unloaded because of snow plowing that day," which he reported in an email to supervisors (*id.* at 25). Orange cites to other logs to show that he "did assign down turn work when a line on my shift was down" (*id.* at 31), and he cites to his payroll logs to show that, by February 3, 2019, he had arrived to work 30 minutes prior as Dominguez required (*id.* at 32).

The fact that Orange can point to days when he completed the tasks required by his supervisor, however, does not mean that he did so perfectly all the time. The question is whether his employer's judgment that overall he was not performing up to standards was honestly held. And for a reasonable jury to conclude that it was, Orange would have to point to something more than evidence that, on certain days, he in fact did the things described in a few items on the list of job deficiencies cited by USSC.

Orange also attempts to show inconsistencies or contradictions in USSC's stated reasons for his termination by pointing to his 2018 job evaluation in which Gillen found that he was meeting expectations in many respects. "Shifting and inconsistent explanations can provide a basis for a finding of pretext. But the explanations must actually be shifting and inconsistent to permit an inference of mendacity." *McCann*, 965 F.3d at 589–90 (quoting *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir. 2003) (internal citation omitted)). Orange's 2018 job evaluation is consistent with USSC's assertion that in some respects Orange's work performance was not meeting

expectations.[8] That other aspects of Orange's job performance may have been acceptable does not render those criticisms suspect. *See, e.g., Martino v. MCI Commc'ns Servs., Inc.,* 574 F.3d 447, 454 (7th Cir. 2009) (rejecting argument that employee met employer's expectations despite job success in certain areas). Orange also claims to have improved in the problem in the area of communications, the area noted by Gillen in the October 2018 review on which Orange needed to work. Orange claims his improvement was acknowledged by Gillen in the 2018 annual review. (DE 44 at 38). But Gillen's 2018 annual review only indicated there was some improvement in the communications area, not that Orange was no longer deficient in any respect in that area. Moreover, Orange ignores Dominguez's concerns, which arose after Gillen's performance review. The fact that Gillen thought Orange improved somewhat in that area does not demonstrate that Orange performed perfectly in the area after that, or that Dominguez's later contrary review was dishonest and thus a pretext for discrimination.[9]

---

[8] Orange's assertion that he "never had any negative comments on [his] reviews" until the 2018 annual review is not supported by the record. Orange's October 2018 review included some negative comments. And his reviews from 2017 covered only the first six months of his employment when Orange was new and when, for half of the evaluation period, Orange was in training.

[9] Orange misstates the contents of an email from Dominguez, which he claims "states that my emails are detailed when communicating delays proving that this issue was corrected before I was even transferred to [Dominguez's] department." (DE 44 at 41). Dominguez actually is telling Orange in the email that he *needed to be* detailed in his emails. *See* (DE 44 at 40) (email to Orange in which Dominguez states that he "explained the expectations of a shift manager working the sheet side" to Orange, including "that [Orange] *needed to* dig deep and learn the processes[,] ask questions[,] [and] *be detailed* when sending out information regarding delays") (emphasis added).

Orange complains that Gillen was responsible for his termination and that Gillen treated him unfairly vis a vis Mead. But even if Orange was unfairly blamed for run-ins he had with Mead (which is unsupported by evidence in the record), "[b]eing blamed unfairly is not evidence of deceit." *Widmar*, 772 F.3d at 466. Orange "has provided nothing more than speculation that the blaming was a mask for discrimination." *Id.* at 465. Furthermore, Orange has not presented any evidence to call into question Gillen's testimony that, not only did Orange fail to meet Gillen's performance expectations, but Gillen also received complaints from both Curosh and Lemons about Orange's performance deficiencies. Gillen testified that he and other Coordinators also received complaints from Orange's crew members who were dissatisfied with Orange's performance and lack of knowledge about processes even though he had been working in the Coatings Department for over a year. Employees and supervisors described Orange as "arrogant", "lazy" "incompetent," "argumentative" and a "know-it-all." Not only does Orange not refute this testimony, he admits that hourly employees in his crew had lied to him and taken advantage of him. This admission tends to support USSC's testimony that Orange's management skills were deficient, that he never wanted to correct his line workers, and that he was easily taken advantage of by them.

Orange also challenges his employer's stated reasons for his termination by arguing that Dominguez's judgments regarding his job performance were either unfair or not credible, based on a comparison to how he says Dominguez treated other Shift Managers. But he fails to provide any evidence that Dominguez's judgments, even if faulty, were intentional lies. Moreover, as previously noted, Orange was in a different

category from other Shift Managers because he was also a Management Associate. Again, it is not up to the Court to decide whether USSC was justified in expecting more from its Management Associates than regular Shift Mangers. The Seventh Circuit has stressed that the court is not to function as a "super-personnel department intervening whenever an employee feels he is being treated unjustly." *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429,435 (7th Cir. 2005). "It is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee." *Widmar*, 772 F.3d at 464. "Rather, the only question is whether the employer's proffered reason is pretextual." *Id.* And that inquiry "mandates looking at [Orange's] job performance through the eyes of [his] supervisors at the time." *Khungar*, 985 F.3d at 574.

Finally, Orange complains that he was terminated rather than allowed time to improve first. But Orange has not refuted USSC's testimony that Management Associates are not covered by progressive discipline policies and that other non-black Management Associates were fired without being subjected to progressive discipline. (DE 43-4 ¶ 3).

In all, other than attacking USSC's "veracity, which is a conclusory allegation that does not defeat summary judgment, [Orange] has not offered any evidence of dishonesty." *Igasaki*, 988 F.3d at 958 (citing *Montgomery v. Am. Airlines, Inc.,* 626 F.3d 382, 389 (7th Cir. 2010) ("[M]ere conclusory allegations do not constitute evidence.")). Accordingly, no reasonable jury could find that Orange was not promoted, disciplined, terminated, or suffered any other adverse employment action, because of his race.

## II.   HOSTILE WORK ENVIRONMENT CLAIM

Orange alleges that he suffered a hostile work environment because of the conduct of his co-worker, Mead. "Harassment sufficiently severe or pervasive to alter the terms and conditions of employment is actionable under Title VII as a claim of hostile work environment." *Cole,* 838 F.3d at 895. "To prove a claim for hostile work environment based on race, an employee must show that: (1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abuse situation; and (4) there is a basis for employer liability." *Id.* at 895-96 (quotation marks and citations omitted). The Court accepts as true Orange's testimony that he was subjected to unwelcome (and quite likely inexcusable) harassment by Mead, thus satisfying the first requirement. But the record does not contain sufficient evidence from which a reasonable juror could find in Orange's favor on any of the remaining three requirements for a hostile work environment claim.

### A.   HARASSMENT BASED ON RACE

The evidence is insufficient for a reasonable juror to conclude that Mead's harassment was based on Orange's race. Almost all of the events listed by Orange as being part of Mead's harassment---the water cooler incident, the coffee remarks, the certificate on the refrigerator, the email incident about forgetting to pay hourly employees, and so on—are connected to race only insofar as they happened to Orange and he is black. As discussed with respect to Orange's disparate treatment claim, "that by itself is not enough to raise a genuine factual dispute as to whether those events

38

constitute race-based harassment." *Cole,* 838 F.3d at 897. Orange states he never did anything to provoke Mead's hostility. That may be true, but without evidence to tie Mead's hostility to race, it is just as likely that Mead was "an equal opportunity bully." *Yancick*, 653 F.3d at 546. Orange testified that he heard rumors that Mead had issues with Dion Sutton, the other black Shift Manager. But there is no competent evidence in the record to support those "rumors." *See MMG Fin. Corp.,* 630 F.3d at 656. Orange testified that he believed Mead's behavior was directed only at him, and not other Shift Managers who were white, because he never witnessed Mead making similar remarks to other Shift Managers. But Orange also admitted that he rarely saw Mead interact in person with other employees because, after his initial training was over (which is when Orange testified the harassment first began), his only contact with Mead was during shift changes when one Shift Manger relieved the other one.

"[F]orms of harassment that might seem neutral in terms of race . . . can contribute to a hostile work environment claim if other evidence supports a reasonable inference tying the harassment to the plaintiff's protected status." *Cole*, 838 F.3d at 896. For instance, "[e]vidence that a workplace is tainted by overt racial hostility can support an inference that other harassment that at first seems race-neutral also has an undercurrent of racial animus." *Id.* (citing, e.g., *Henderson v. Irving Materials, Inc.,* 329 F. Supp. 2d 1002, 1010 (S.D. Ind. 2004)). "A harasser's actions or remarks that do not seem based on unlawful animus may be 'sufficiently intertwined' with discriminatory remarks to conclude that discriminatory animus motivated all of them." *Id.* at 896. "Whether the inference is appropriate depends on the circumstances of the case; if so, the superficially neutral

events are properly considered as part of 'the entire context of the workplace.'" *Id.* at 897 (quoting *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1046 (7th Cir. 2002)). But these principles are not implicated here because there is no evidence of racially motivated harassment to which Orange can tie the facially neutral harassment he experienced. Orange admits that he never heard Mead making any racial slur or hostile remark directly to him. His conclusion that Mead's hostility towards him was because of his race was based on the two remarks about the Cadillac belonging to Orange and about confederate statutes being taken down, both of which Orange interpreted as being racially offensive. (Dep. at 55) ("[T]hose are the only two things racially that came out of him."). The two comments by Mead, however, do not themselves reveal racial hostility. *See, e.g., Yancick*, 653 F.3d at 544-45 ("Yancick believes that Johnson may have raised his fist as a black power symbol, but there is a lack of support showing that Johnson's gesture was meant as a racial attack."). While context and tone could certainly lead one to the conclusion that these remarks were evidence of racial hostility, Orange himself indicated that he made no remarks expressing his feelings at the time, and did not make any immediate complaints to supervisors, as discussed in more detail below. Moreover, when Orange did first address his concerns about Mead was making his job more difficult with Gillen, he did so without reporting "the harassment side of it." Again, this is not to excuse any of Mead's comments. The question is only whether they create a triable issue of fact. They do not. A reasonable juror could not conclude that the conduct discussed above rose to a level that violates Title VII.

This conclusion is further buttressed by the fact that Orange himself speculates there were reasons other than race that Mead acted so poorly towards him. According to Orange, Mead was likely jealous of the fact that Orange had an engineering degree, and, because of that degree, obtained an entry level position equivalent to the position Mead had worked his whole life at USSC to secure. Orange also speculated that "it's a generational issue because him being older … He was probably definitely not used to a young, black employee coming in with a college degree." Orange also stated that Mead was towards the end of his career and was known as being irritable, and that he took his mistakes out on Orange because he thought he could get away with it. Orange talked about one time when Mead knew he had made a mistake and then blew up at Orange, but apologized that same night. Orange testified that he did not believe that incident was racially motivated.

These admissions undermine Orange's racial harassment claim. *See Patton*, 276 F.3d at 339 (where the plaintiff stated that the "abusive conduct was purely personal"). Under Title VII, a hostile work environment exits only when "the victim was singled out *because of his or her [race]*." *Johnson v. Hondo, Inc.*, 125 F.3d 408, 415 (7th Cir. 1997) (emphasis added). Title VII "does not guarantee a utopian workplace or even a pleasant one." *Vore v. Ind. Bell Tel. Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994). As long as the hostility was not based on protected characteristic, Title VII is not implicated." *Patton*, 276 F.3d at 339.

### B.    SEVERE OR PERVASIVE

Apart from the lack of sufficient evidence to show a connection between the harassment and Orange's race, even accepting as true every detail of Orange's

description of the harassment by Meade, a reasonable jury could not find the harassment was so severe or pervasive that it created an environment sufficiently abusive to be actionable. The factors to consider in making this determination is "whether conduct is 'physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance.'" *Cole,* 838 F.3d at 897 (quoting *Porter v. City of Chicago*, 700 F.3d 944, 956 (7th Cir. 2012), quoting *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009)). The court must consider the entire context of the workplace and not focus on discrete acts. *Yancick*, 653 F.3d at 544. As previously noted, Orange describes only two incidents with possible racial overtones. Two incidents of this nature that perhaps reflect racial animosity but also may just have been merely insensitive are not enough to create a hostile work environment under binding 7th Circuit caselaw. *E.g., Ford v. Marion Cnty. Sheriff's Office,* 942 F.3d 839, 857 (7th Cir. 2019) (holding that an employer's comment that insinuated that an employee faked her disability to avoid work, among several less serious comments, was insufficient to establish a hostile workplace); *Yancick,* 653 F.3d at 546 ("Even though Johnson may have made some gestures or comments that were racial in nature, Yancick hasn't established that Johnson's conduct was anything more than immature and ignorant behavior."); *Scruggs,* 587 F.3d at 836 (occasional inappropriate comments, even quite disturbing ones, did not rise to the level of objectively hostile work environment"); *Forman v. City of Middleton*, No. 20-CV-516-JDP, 2021 WL 5038752, at *6 (W.D. Wis. Oct. 29, 2021) ("a single off-hand comment or isolated incident, unless it is extremely serious, isn't enough to constitute hostile workplace harassment"). This is not, of course, to say that Orange must have endured

42

hellish conduct merely to have a valid legal claim. "The issue is whether the discriminatory conduct [Orange] testified to qualifies as sufficiently severe *or* pervasive to alter the conditions of his work environment." *Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 637 (7th Cir. 2019). Here, that is not the case, especially when the comments at issue were made by a co-worker, not a supervisor. *Id.*

It is also relevant that neither of the incidents in question were directed at Orange.[10] *See Yancick*, 63 F.3d at 545 (while incidents directed at others and not the plaintiff are relevant, the more remote or indirect the act claimed to create a hostile working environment, the more attenuated the inference that it had an effect on the terms and conditions of the plaintiff's workplace." (citing *Smith v. Sheahan*, 189 F.3d 529, 534 (7th Cir. 1999))); *Forman*, 2021 WL 5038752, at *6 ("comments not directed at an employee are less indicative of harassment than direct comments" (citing *Tarpley v. City Colleges of Chi.*, 752 F. App'x 336, 348 (7th Cir. 2018) (citing *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271 (7th Cir. 2004)).

Also relevant is Orange's "inaction in following up on his complaints or taking them up the chain when no apparent action was taken by [Gillen]." *Yancick*, 653 F.3d at 545. This inaction "belies the notion that [Mead's] harassment was severe or pervasive." "For the most part, [Orange's] complaints to [Gillen] focused on [Mead's] general hostility in the workplace, not racial tension." *Id.* That is likely because, as Orange

---

[10] Meade's comment about the Cadillac was directed to a contractor, and his comment about the confederate statutes was directed to Jon Lemons, a line coordinator in the Coatings Department.

testified, "there were several reason why [he] believed [Mead] harassed him," including jealousy, fear of making mistakes, and general irritability. *Id.* (plaintiff testified that the reasons included "'the Alpha-dog syndrome,' transfer of jobs, steroid use, and racism").

The Court does not doubt, based on Orange's account of his interactions with Mead, that he had a poor relationship with Mead and that this made his work environment unpleasant. But "[m]any employees have to put up with some amount of rude, arrogant, or boorish behavior at work." *Patton,* 276 F.3d at 339; *see also Casper v. Gunite Corp.,* 221 F.3d 1338 (7th Cir. 2000) (rudeness, impatience, and personality conflicts do not constitute an ADA violation). Reviewing Mead's conduct in the aggregate reveals "boorish conduct and unexplained animosities toward" Orange (who happens to be black), "but not to the extent that it meets the legal requirements of [finding a hostile work environment]." *Durkin v. City of Chi.,* 341 F.3d 606, 613 (7th Cir. 2003). No reasonable jury could conclude from Orange's testimony that Mead's conduct towards Orange "created an environment permeated with 'discriminatory intimidation, ridicule, and insult' severe enough to create an abusive working environment." *Forman*, 2021 WL 5038752, at *6 (quoting *Ford*, 942 F.3d at 851)). Again, this is certainly no excuse for such behavior. It is merely a recognition that it fails to give rise to the legal claims at issue.

## C.   BASIS FOR EMPLOYER LIABILITY

Finally, Orange fails to present evidence to support the fourth element of his claim: a basis for employer liability. "After the Supreme Court's decisions in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), [the court] evaluate[s] the fourth prong regarding the basis for employer liability

differently depending on whether the alleged harassment was perpetrated by supervisors or coworkers." *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004). Employers are strictly liable for supervisor harassment, but when a plaintiff "claims coworkers alone were responsible for creating a hostile work environment, he must show that his employer has 'been negligent either in discovering or remedying the harassment.'" *Id.* (quoting *Mason v. S. Ill. Univ.*, 233 F.3d 1036, 1043 (7th Cir. 2000)).

Generally speaking, "[a]n employer is not liable for co-employee sexual harassment when a mechanism to report the harassment exists, but the victim fails to utilize it." *Durkin*, 341 F.3d at 612–13. It is undisputed that USSC "requires all of its employees to abide by a Code of Ethics and various policies, including those relevant to this case that prohibit discrimination, harassment, and retaliation in the workplace"; the policies include a Code of Ethical Business Conduct, an Equal Employment Opportunity policy, and a Sexual and Discriminatory Harassment policy; the "policies require employees to 'promptly' report to management (i.e. an employee's direct supervisor or the supervisor's direct supervisor) any claimed violations"; and, the "policies also allow employees to direct complaints to the appropriate Employee Relations Manager or Human Resources Manager or through [USSC's] Ethics Line." (DE 41 ¶ 4; DE 43-6). It is also undisputed that Orange did not report Mead's alleged behavior to anyone other than Gillen, and, as discussed, those concerns initially omitted any issues of harassment.

The Court is skeptical that a reasonable jury could conclude from Orange's testimony that he reported to Gillen that Mead was *racially* harassing him, as opposed to just harassing him. "[V]ague complaints unrelated to racial hostility are insufficient to

establish employer liability." *Yancik*, 653 F.3d at 550. "Employers need not divine complaints from the ether, guessing at the subjective suspicions of employees. An aggrieved employee must at least report—clearly and directly—nonobvious policy violations troubling him so that supervisors may intervene." *Montgomery*, 626 F.3d at 392 (finding insufficient notice where complaints were too vague to put plaintiff on notice of racial harassment).

Orange testified that Mead was harassing him from approximately September 2017 through January 2019. While he claims to have reported the harassment to Gillen, he admitted that he only reported "racial discrimination" by Mead twice during a review in October 2017. His testimony concerning that report, however, is that he reported racial 'discrimination," not harassment. Of course, Orange is entitled to a workplace free of racial discrimination or racial harassment. However, for USSC to take action on complaints, it needs to be informed of the nature of Orange's accusations. As discussed, Mead was a co-worker, who had no supervisory authority over Orange, making it difficult to see how he could take discriminatory job actions. However, given that this could be attributed to semantics and warrant further inquiry by USSC, it will be considered for purposes of determining whether there are any triable issues of fact in Orange's Title VII claim.

Orange's testimony is conclusory; he gives no details about the content of what he said in reporting "racial discrimination." Further, he testified that the only time he reported the harassment to Gillen as being race-based was in 2017, one to two months after the harassment began, and that was during a job performance evaluation. The

harassment allegedly became worse in 2018, when Orange admittedly did not make any reports of racial harassment to anyone.

Nothing in the record would allow a reasonable jury to conclude that Gillen "was negligent in failing to discover or remedy the alleged racially hostile environment." *Yancik*, 653 F.3d at 550 (questioning "whether the nature of [the plaintiff's] complaints would have been sufficient . . . to make a reasonable employer think there was some probability that he was being racially harassed"). "Without employer knowledge of harassing conduct, the law does not require an employer to do more than promote general anti-harassment policies and training to ensure compliance with Title VII." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 507 (7th Cir. 2004), *overruled in part on other grounds, Ortiz*, 834 F.3d at 764. The Court finds that no reasonable jury could conclude on the record before this Court that USSC either had actual notice, or was negligent in not knowing, that Orange was subjected to a hostile work environment based on race in the 2017-2018 period in which he was working with Mead in the Coatings Department.

## III.   RETALIATION

Orange's last set of claims is based on alleged retaliation. Specifically, Orange contends that Gillen and Dominguez retaliated against him for complaining about the harassment he suffered from Mead, and that Gillen and Curosh retaliated against him for taking FLMA leave.

### A.   TITLE VII RETALIATION

Title VII prohibits discriminating against an employee "because he has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e–3(a).

To succeed on such a claim, Orange must show that he engaged in a statutorily protected activity. *Orton–Bell v. Indiana*, 759 F.3d 768, 776 n.6 (7th Cir. 2014). "This requires more than simply a complaint about some situation at work, no matter how valid the complaint might be. To be protected under Title VII, his complaint must have indicated 'the discrimination occurred because of sex, race, national origin, or some other protected class.... Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.'" *Cole*, 838 F.3d at 901 (quoting *Orton–Bell,* 759 F.3d at 776, quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006))).

The only protected activity under Title VII that Orange arguably engaged in was complaining to Gillen about racial harassment by Mead.[11] As previously discussed, however, Orange's testimony about his oral reports to Gillen concerning harassment by Mead is conclusory and would not support a reasonable jury finding that he in fact engaged in statutorily protected activity. Indeed, Orange himself describes his Title VII retaliation claim as being based on "the last altercation with Bill Mead … which resulted in [his transfer] . . . to the Cold Mill and then ultimately fired." (Dep. at 141). And Orange testified that there was no mention of race in the last altercation with Mead where they accused each other of not paying their crew. (Dep. at 70). His discussion with Gillen after the incident, too, was about the incident itself. (Dep. at 135-36). Orange reporting the

---

[11] Orange includes Dominguez in this retaliation claim, but there is nothing in the record to tie him to any alleged "protected activity."

December 2018 incident was not a protected activity because there is no evidence he reported racial harassment at that time. Given that Orange has not presented evidence that he engaged in a protected activity that led to his termination, his Title VII retaliation claim fails as a matter of law.

Alternatively, the Court will assume that Orange's 2017 reports to Gillen about Mead's racial harassment was the "protected activity," rather than, as Orange testified, his report about the December 2018 email incident, and that those reports were sufficient to notify Gillen of the harassment. In that case, the rest of the Court's retaliation analysis would "mirror" its discrimination analysis. *See Alexander*, 739 F.3d at 983. And, for all of the reasons previously discussed, no reasonable jury could conclude that Orange's complaint about Mead's racial harassment (the "protected activity") was the cause of his transfer and then discharge.

### B.   RETALIATION FOR TAKING FLMA LEAVE

"The FMLA provides that it is unlawful for an employer 'to discharge or in any manner discriminate against' any employee for opposing any practice the FMLA makes unlawful." *Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 995 (7th Cir. 2010) (quoting 29 U.S.C. § 2615(a)(2)). "Firing an employee for taking a valid leave falls within this prohibition." *Malko v. CGS Premier, Inc.*, No. 20-CV-1831, 2022 WL 103379, at *3 (E.D. Wis. Jan. 11, 2022) (citing *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 819 (7th Cir. 2015)). "Retaliation claims under the FMLA require that: '(1) the employee engaged in statutorily protected activity; (2) the employer subjected [him] to an adverse action; and (3) the protected activity caused the adverse action.'" *Id.* (quoting *Riley v. City of Kokomo*,

909 F.3d 182, 188 (7th Cir. 2018)). The first two elements are not in dispute. Thus, the only issue is whether the evidence is sufficient for a reasonable jury to conclude that Orange's FMLA leave caused USSC to fire him (or take some other adverse action).

To establish the causation element, Orange "does not need to prove that retaliation was the only reason for [his] termination; [he] may establish an FMLA retaliation claim by showing that the protected conduct was a substantial or motivating factor in the employer's decision." *McCarty v. Purdue Univ.*, No. 4:19-CV-43 JD, 2021 WL 3912564, at *14 (N.D. Ind. Sept. 1, 2021) (internal quotation marks and citation omitted). "A motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions." *Id.* (quoting *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 742 (7th Cir. 2008)).

Orange "believe[s]" that Gillen and Curosh "might have retaliated against [him] for taking [sic] FMLA leave" based on "rumors" he heard from several line workers that they were not happy about Orange's FMLA leave. (Dep. at 164-71). Orange also cites to the "Mr. Mom" incident. Rumors are not evidence, *MMG Fin. Corp.*, 630 F.3d at 656, and Orange does not know who replaced his name with the words "Mr. Mom" (Dep. 103-106). The record is devoid of any evidence, direct or circumstantial, that Orange was transferred to the Cold Roll Department, received negative performance reviews, was terminated, or suffered any of the other actions about which he complains because he took FMLA leave in July-September 2018.

Orange reiterates his previously discussed arguments about job performance issues being a pretext for his termination, as well as about what he considers to be

50

suspicious timing of his negative 2018 performance review and his transfer to the Cold Roll Department followed by his termination—all of which occurred after he took FMLA leave. "Nothing about this timeline suggests . . . that [Orange's FMLA leave] was a motivating factor in [the decision to terminate him] because the adverse employment action is too distant from the protected activity to fairly be considered close on [its] heels. Indeed, it is clear from [Seventh Circuit] case law that the time period between the protected activity and the adverse action must be very close, —as in no more than a few days." *Bless v. Cook Cnty. Sheriff's Office*, 9 F.4th 565, 572 (7th Cir. 2021) (internal quotation marks and citations omitted). "Given the lapse of several months between" Orange's FMLA leave and Orange's transfer, and with three more months before he was terminated, "this evidence—without more—is not enough to satisfy his burden under the third element." *Id.* "Furthermore, allowing such an inference would be even more inappropriate when [the Court] consider[s] the context in which" Orange was terminated. *Id.* "[W]here a significant intervening event separat[es] an employee's protected activity from the adverse employment action he receives, a suspicious-timing argument will not prevail." *Id.* Once Orange was transferred to the Cold Roll Department, he admittedly received a great deal of negative feedback from Dominguez regarding his job performance. And, as has been discussed, the evidence is insufficient for a reasonable jury to conclude that the job performance issues cited by Dominguez in notifying Orange of his termination were pretext.

For all of these and the reasons already discussed, the evidence is insufficient to infer that USSC's termination of Orange was based on Orange having taken FMLA leave.

## CONCLUSION

"Summary judgment is not a dress rehearsal or practice run; it is the . . . [moment] when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Schacht v. Wis. Dept. of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999). If no reasonable jury could find for the nonmoving party, then there is no "genuine" dispute, and summary judgment is appropriate. *Scott v. Harris*, 550 U.S. 372 (2007). As discussed above, no reasonable jury could find in favor of Orange on any of his discrimination or retaliation claims. Accordingly, Defendant United States Steel Corporation's Motion for Summary Judgment **[DE 39]** is **GRANTED**. The Clerk is **DIRECTED** to enter judgment in favor of Defendant.

So ORDERED this 30th day of March, 2022.

s/ Joshua P. Kolar
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT